UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **13-24320**

CIV-ALTONAGA

MAGISTRATE JUDGE
SIMONTON

FILED by ___ D.C.

NOV 2 7 2013

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA, *ex rel.*
PHILIP CHEN, MD, PhD and
JOSHUA YELEN,

        Plaintiffs/Relators,

v.

UNIVERSITY OF MIAMI and
JACKSON MEMORIAL HOSPITAL,
PUBLIC HEALTH TRUST OF MIAMI-
DADE COUNTY

        Defendants.

                          /

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

_____

**COMPLAINT FOR MONEY DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730); AND
FLORIDA FALSE CLAIMS ACT  (Fla. Stat. §§ 68.081 – 68.09)**

_____

## NATURE OF THE CASE

1)      Since 2006, the University of Miami ("UM"), through its Department of Surgery's Immunomonitoring Laboratory ("IML")[1] and in concert with Jackson Memorial Hospital ("JMH")[2], has been orchestrating a fraud on the federal government by creating and perpetrating an illegal kickback scheme designed to overbill, overcharge, and over-utilize unnecessary lab testing, causing an adverse impact to organ transplant and non-transplant patients' lives and causing a huge expense to the federal government. In an effort to exploit its sixty (60) plus year relationship with JMH, UM and JMH instituted sweeping changes to its transplant pathological laboratory testing program, moving laboratory testing for JMH organ transplant patients from JMH's Department of Pathology to UM's IML. These changes were designed to evade the Medicare hospital cost reporting rules and to obtain millions of dollars in additional federal funds paid to the JMH transplant program. Instead of performing these tests at JMH where it had been previously performed at lower costs, IML charges substantially higher rates to JMH which then passed the overinflated cost onto the federal government through Medicare hospital cost reports. The funds obtained were then used to directly benefit UM surgeons and the UM Department of Surgery by paying incentives to keep the surgical procedures and peri-surgical care at JMH instead of moving these services to the University of Miami Hospital. The potential increased laboratory revenues to JMH were significant but paled in comparison to the possibility of the powerful UM surgeons moving surgery from JMH to the University of Miami Hospital. The surgeons, and especially the leadership in the Department of

---

[1] UM's Department of Surgery's Miami Transplant Labs include IML and the Histocompatibility Lab ("HLA Lab"). The claims referenced below involve procedures performed at both IML and the HLA Labs, and will be jointly referred to as "IML".

[2] The legal name of the Defendant is Jackson Memorial Hospital, Public Health Trust of Miami-Dade County.

1

Surgery, were subsequently rewarded with large bonus payments for their financial success, which were largely driven from these unscrupulous billing practices.

2)      After colluding to implement this change, JMH turned a blind eye to the illegal billing practices and unnecessary testing conducted by IML.  In fact, this unlawful arrangement became mutually beneficial and financially rewarding for both entities. IML has collected millions of dollars by performing unnecessary procedures and overbilling Medicare and JMH has been unjustly enriched by receiving Medicare payments for services conducted by IML. As a result, the Defendants have knowingly submitted false claims to Medicare and other federally-funded health care programs for improper medical laboratory testing to keep the UM surgeons, who operate at JMH, complacent and in agreement to maintain full surgical schedules at JMH.  The highest levels of leadership at both UM and JMH, including UM President Donna Shalala and JMH Chief Executive Officer Carlos Migoya, have been aware of these fraudulent activities and have done nothing to stop the activities nor implement the Relators' proposed corrective actions.

3)      Dr. Philip Chen and Joshua Yelen ("Relators"), now bring this action on behalf of the United States, pursuant to the False Claims Act ("FCA") and the Florida False Claims Act ("FFCA"), to recover those funds that the Defendants, UM and JMH, have improperly obtained and retained as a result of the fraudulent conduct described herein.

4)      Since at least 2010, Relators have witnessed the Medicare fraud during their employment at UM's Department of Pathology.  UM's senior management has disregarded Medicare regulations and, more importantly, the health and welfare of their patients.  Relators' multiple complaints about the improper, inefficient, and illegal arrangement between UM's IML and JMH have fallen on deaf ears.

5) Since 2010, the Relators have complained to the senior management of both UM and JMH regarding the unlawful practices of UM/IML and JMH in overcharging for routine laboratory testing that JMH could have, and had previously, performed in-house at lower costs to the government programs, especially Medicare. Relators further complained that IML and UM were double-billing Medicare for the same procedures and falsely billing under the inapplicable TC Grandfather Provision. Finally, Relators complained that patients were undergoing excessive, unnecessary, and improper laboratory testing solely billed to Medicare and other federal payors to create increased revenues in order to meet revenue targets which were tied to annual merit increases, bonuses, and other financial benefits enjoyed by the UM surgeons and IML operators. Despite Relators' complaints and multiple investigations, Defendants failed to notify either the affected patients or Medicare. Instead of making the required refunds to Medicare for these false claims, Defendants have concealed the overpayments that resulted from their scheme and have illegally kept such overpayments for themselves as profit.

6) Moreover, instead of making the necessary systemic changes needed to avoid such pervasive fraud in the future, the Defendants have simply continued to bill Medicare for excessive, unnecessary, and improper laboratory procedures and have falsely certified the medical necessity and appropriateness of those claims.

7) The Defendants have also repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in the Medicare program, including the anti-kickback provision, when they knew that they were not in compliance, thereby knowingly submitting additional false claims to Medicare.

8) Accordingly, the Defendants have repeatedly and systemically violated federal law as they have: (a) submitted claims to Medicare and other government programs for medical

3

procedures which they had reason to know were unnecessary and excessive, were performed without the ordering physicians' acknowledgment and orders, were incompatible with standards of accepted medical practices including Clinical Laboratory Improvement Amendments ("CLIA"), the College of American Pathologists ("CAP"), and The Joint Commission of Hospital Accreditation, were experimental and without appropriate validation or clinical validity and were of no medical value; (b) falsely certified their compliance with the conditions of participation in the Medicare program when they knew that they were not in compliance with such prerequisites; (c) failed to return to the federal government such payments that they were not entitled to receive and that they knew they were not entitled to retain; and (d) benefitted from an unlawful kickback scheme designed to ensure that surgeries would stay at JMH while UM's Department of Surgery reaped the rewards of higher revenues and larger bonuses for the surgeons, Dr. Ruiz, and the Department of Surgery's leadership.

9)      The end result of these false claims is the illegal enrichment of the Defendants and the corresponding misappropriation of tens of millions of taxpayer dollars.

10)      On behalf of the United States, Relators seek to recover these money damages as well as civil penalties arising from the false claims that Defendants caused to be submitted to the United States. Additionally, Relators seek to recover from Defendants money damages caused by the wrongful retention of overpayments and refunds that are due and payable to the United States.

11)      As explained in detail herein, the existence of these fraudulent practices, and their widespread and ongoing nature, is supported not only through the Relators' personal knowledge but also through well documented evidence attached as exhibits hereto.

4

## JURISDICTION AND VENUE

12)     This action is brought under the qui tam provisions of the United States False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA").  The FCA provides, *inter alia*, that any person who knowingly submits a false or fraudulent claim to the federal government for payment or approval is liable to the federal government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of the false claim.  31 U.S.C. § 3729(a).

13)     This action is also brought under the *qui tam* provisions of the Florida False Claims Act, § 68.082 et seq. ("FFCA").  The FFCA provides, *inter alia*, that any person who knowingly submits a false or fraudulent claim to the State of Florida for payment or approval is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person. § 68.082, Fla. Stat.

14)     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b).

15)     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendant, University of Miami, is located in and conducts business in the Southern District of Florida, and Defendant, Jackson Memorial Hospital, Public Health Trust of Miami-Dade County, is located in and conducts business in this District.  Moreover, most, if not all, of the acts proscribed by 31 U.S.C. § 3729 and § 68.082, Fla. Stat. that are alleged in this Complaint occurred in this District.

16)     Venue lies within the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a), because the acts and practices alleged in this Complaint

occurred in this District and both of the Defendants can be found, reside, or transact business in this District.

## THE PARTIES

### I.    The Relators

17)    Under both the FCA and the FFCA, a person with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government and himself.

18)    Relator, Philip Chen, M.D., Ph.D., a resident of Miami, Florida, is the Vice Chair and Chief of Clinical Pathology in the Department of Pathology, the Director of Pathology Informatics for the entire University of Miami Miller School of Medicine and the Medical Director for laboratories at the University of Miami Hospital, University of Miami Hospital and Clinics, and Jackson Memorial Hospital.  Dr. Chen, originally from Taiwan, earned his undergraduate degree from the University of South Florida.  He then completed his medical education (also receiving a doctoral degree) at the University of Alabama at Birmingham, specializing in Molecular and Cellular Pathology.  Upon graduation, he completed his Clinical Pathology Residency at the Brigham and Women's Hospital at Harvard Medical School. Dr. Chen is a board certified pathologist licensed to practice medicine in Florida.

19)    Prior to joining the University of Miami, Dr. Chen was the Founder and Chief Executive Officer of Cognoscenti Health Institute and then the Chief Medical Informatics Officer at Sonic Healthcare, one of the largest medical diagnostics companies in the world operating in eight (8) countries on three (3) continents. Dr. Chen joined the Department of Pathology at UM in June 2010 as the Director of Informatics and as a full-time professor and subsequently was promoted to his current position in February 2012.

20)    Relator, Joshua Yelen, a resident of Miami, is the Vice Chairman for Administration, Department of Pathology at the University of Miami, and has held said position since November 2010.  Mr. Yelen has been with the University of Miami for almost nine (9) years and was promoted twice during his tenure.  Mr. Yelen's duties include the oversight of departmental finances and billing units for its clinical, research, and education programs.  Mr. Yelen is an outstanding business and civic leader and was recognized by the Miami Herald as one of Miami-Dade's Top 20 Leaders Under 40 years of age for his business and civic contributions.[3]

21)    All allegations herein are based on evidence obtained directly by the Relators, independently, and through their own labor and efforts.  The information and evidence they have obtained or of which they have personal knowledge, and upon which these allegations regarding violations of the False Claims Act are based, consist of their personal experiences while employed at UM, conversations with authorized agents and employees of the Defendants, and knowledge of other actions taken pursuant to practice and/or instructions given to them and other employees by Defendants while employed at UM and JMH.

22)    None of the allegations set forth herein are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from the news media. Rather, they are the independent declarations of the Relators.

23)    The Relators are an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

---

[3]*See* article dated May 9, 2011 (Exhibit "A").

24)     Prior to the filing of this Complaint, Relators have voluntarily, through their attorneys, made all appropriate disclosures to the federal government, pursuant to 31 U.S.C. § 3730.

25)     The Relators have also complied with the statutory obligation to file this Complaint under seal, without service on Defendants, for sixty (60) days, pursuant to 31 U.S.C. § 3730(b)(2) and § 68.083, Fla. Stat.

## II.    The Defendants and Their Businesses

26)     The University of Miami is a Florida not-for-profit corporation with its principal place of business located in Coral Gables, Florida. It is the second largest private employer in Miami-Dade County, Florida.  The University of Miami owns and/or operates three university hospitals, including its acute-care University of Miami Hospital, and specialty hospitals Bascom Palmer Eye Institute, and University of Miami Hospital and Clinics, a specialty cancer hospital. In addition, the University of Miami has two major affiliated institutions: Jackson Memorial Hospital and Miami Veterans Administration Hospital, along with more than thirty (30) outpatient facilities throughout Miami-Dade, Broward, Palm Beach, Monroe, and Collier Counties employing more than 1,500 physicians and scientists, and over 8,200 associates.

27)     The University of Miami Department of Surgery, which operates the IML laboratory, is chaired by Alan S. Livingstone, M.D., and operated by Rafic Warwar, its Vice Chair for Administration.  IML is part of the Department of Surgery's Division of Transplantation, whose sole pathologist is Phillip Ruiz, M.D., Ph.D.  UM, by and through its management, employees, and agents, including but not limited to, Dr. Livingstone, Mr. Warwar, UM President Shalala,[4] and UM Medical School's Chief Financial Officer and Interim Chief

---

[4] See email from Jennifer McCafferty-Cepero, Chief Medical Compliance Officer at UM Medical School, to Richard Cote, M.D. and Relator Chen dated January 8, 2013 (Exhibit "B").

Operating Officer, Joseph Natoli, are fully aware of the allegations set forth herein and have failed to implement affirmative corrective action.

28)     Dr. Phillip Ruiz is a board certified anatomic pathologist and immunopathologist and is employed as the Medical Director of the Transplant Laboratories, and Director of Immunopathology at the University of Miami Department of Surgery.  Dr. Ruiz is a licensed physician practicing in Miami, Florida. Though much of the testing in IML involves clinical pathology, Dr. Ruiz is not trained or board certified in clinical pathology and is not qualified to perform clinical tests offered by IML under the bylaws, policies and procedures at both UM hospitals and JMH.[5]  Dr. Ruiz does not have active privileges to practice medicine at JMH, yet he continues to do so.

29)     Defendant, Jackson Memorial Hospital is a public, non-profit, tertiary care teaching hospital located in Miami, Florida.  It is the third-largest public hospital in the United States with more than 1,550 beds. JMH is also the major teaching hospital of the University of Miami Miller School of Medicine and is the third-largest teaching hospital in the country JMH's Miami Transplant Institute ("MTI") is the only transplant center in Florida that performs every type of organ transplant, including kidney, heart, pancreas, liver, lung, and intestinal – for both adult and pediatric patients.  Within Florida, it is the only transplant program within a 280-mile radius and it also attracts international collaboration and patient referrals from around the world. MTI is one of the largest and most comprehensive transplant centers in the world performing more than 450 transplants each year, and operating one of the largest pediatric transplant programs in the United States.

30)     Though MTI is part of JMH, it is operated by UM employees and physicians. All patients at MTI are registered patients at JMH, which submits bills to the federal government for

---

[5]*See* email from Richard Cote, M.D. to Relators, dated November 13, 2012 (Exhibit "C").

services provided to patients covered by Medicare and other governmental programs. Dr. Livingstone, the Chair of the Department of Surgery at UM, was the Director of MTI until October 2012. .

31)     JMH, by and through its management, employees, and agents, including but not limited to, Dr. Livingstone, Chief Executive Officer Carlos A. Migoya, Chief Operating Officer Donald Steigman, and Senior Vice President and Chief Administrative Officer Alex E. Contreras-Soto, are fully aware of the allegations set forth herein and have failed to implement affirmative corrective action.

## APPLICABLE LAW AND REGULATIONS

### III.   The False Claims Act and the Florida False Claims Act

32)     The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

33)     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

34)     The FFCA, provides in pertinent part that:

> [A]ny person who (a) knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; (c) conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; ... or (g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency, is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

§ 68.082(2), Fla. Stat.

35)     The terms "knowing" and "knowingly" in the FFCA provisions above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." § 68.082(1)(c), Fla. Stat.  No proof of specific intent to defraud is required. § 68.082(1)(c), Fla. Stat.

**IV.   The Anti-Kickback Statute**

36)     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity  of the healthcare industry from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

37)     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for

11

federally-funded medical services, including services provided under Medicare, Medicaid, and

TRICARE programs.  In relevant part, the statute states:

    (b)  Illegal remuneration

        (1)    whoever  knowingly  and  willfully  solicits  or  receives  any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

            (A)    in return for referring  an  individual  to  a  person  for  the furnishing  or  arranging  for  the  furnishing  of  any  item  or service for which payment may be made in whole or in part under a Federal health care program, or

            (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

        shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

        (2)    whoever  knowingly  and  willfully  offers  or  pays  any  remuneration (including  any  kickback,  bribe,  or  rebate)  directly  or  indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

            (A)    to  refer  an  individual  to  a  person  for  the  furnishing  or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

            (B)    to  purchase,  lease,  order,  or  arrange  for  or  recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

        shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Violation of the statute can also subject the perpetrator to exclusion

from participation in Federal health care programs and civil monetary penalties of $50,000 per

violation and treble damages for the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7)

## V.  The Medicare Program: Cost Reporting And Claims Processing Procedures

38)  In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.

39)  Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

40)  CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

41)  There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. §§ 1395c to i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.42 U.S.C. §§ 1395j to w-5.

42)    Under Medicare Part A, hospitals, like JMH, enter into an agreement with Medicare to provide health care items and services to treat patients who are beneficiaries under the Medicare Program. The hospital, also called a "provider", is authorized to bill Medicare for that treatment. Most hospitals, including the Defendant hospitals, derive a substantial portion of their revenue from the Medicare Program.

43)    In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the information contained in a provider's claim forms to determine whether and what amounts the hospital is owed.

44)    In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary. The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost charges by cost center. 42 C.F.R. § 413.20; 42 U.S.C. § 1395g. While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has

already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64.  Indeed, a key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud.

45)    Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  However, although Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them.  It is also generally known through the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

46)    To that end, the Hospital Cost Report (Form 2552) contains the following warning:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

47)    That notice is then followed by a "Certification", which must be signed by the chief administrator of the provider or a responsible designee of the administrator, and includes certification that the provider is in compliance with all laws, including Anti-Kickback regulations.

48)    Under Medicare Part B, physicians and independent laboratories, like IML, must enroll with Medicare to be eligible for payment of covered medical services provided to treat patients who are beneficiaries under the Medicare program.  The physician and the independent laboratories are authorized to bill Medicare for treatment.  Many physicians, hospitals, and pathology laboratories, including the Defendant laboratory, derive a substantial portion of their revenue from the Medicare Program.

49)    In order to get paid from Medicare, a provider completes and submits a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated as CMS-1500.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS-1500 to determine whether and what amounts the provider is owed.  Moreover, by submitting CMS-1500 forms, physicians and physician groups certify that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

50)    To this end, the Health Insurance Claim Form, CMS-1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## IV.   Conditions of Participation and Conditions of Payment

51)     To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### A.      Medical Necessity and Appropriateness Requirements

52)     One such important requirement for participating in the Medicare Program is that claims may be submitted to Medicare only when medical goods and services are shown to be medically necessary.  42 U.S.C. §§ 1395y(a)(1)(A),(B); 42 U.S.C. § 1320c-5(a).

53)     Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  Medicare claim forms also require that providers certify that the information submitted is correct and supported by appropriate documentation and treatment records.  42 U.S.C. §§ 1395y(a)(1)(A),(B); 42 U.S.C. § 1320c-5(a).

54)     The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### B.     Obligation To Refund Overpayments

55)     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they have become aware of in their claims for Medicare reimbursement. 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); *see also* 42 C.F.R. §§ 489.40, 489.41.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments to the Medicare carrier, and the failure to do so constitutes a felony.  Providers' contracts with CMS

carriers or fiscal intermediaries also require providers to refund overpayments.  *See, e.g.,* 42 C.F.R. §§ 489.20(f), 489.40-42.

56)     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  In such cases, the overpayment is subject to recoupment.  42 U.S.C. §1395gg.  CMS is entitled to collect interest on overpayments.  42 U.S.C. §§ 1395g(d), 1395l(j).

## V.     Medicare Billing for the Technical Component of Pathology Services for Hospital Patients

57)     Prior to the passing of the Benefits Improvement and Protection Act of 2000 ("BIPA"), independent pathological laboratories providing services to hospital inpatients or outpatients were allowed to bill and submit claims under the Medicare physician fee schedule for technical component ("TC") directly to Medicare Part A/B or an insurance carrier.  With the passing of BIPA, effective January 1, 2001, the "fee-for-service" arrangement for TC provided by an independent laboratory in a hospital was discontinued in favor of a direct payment to the hospital who would then compensate the laboratory for any TC services.  Moreover, where the TC service is bundled into the facility payment, as is the case with JMH, no payments for TC services should be made under Part B, including the physician fee schedule and the clinical laboratory fee schedule.

58)     However, in enacting the legislative change, an exception was made for longstanding independent laboratory – hospital relationships.  The "TC Grandfather" exception allowed independent laboratories to bill Medicare Part B directly and be paid for the TC of pathology services that they provided for patients at certain "covered" hospitals.  Medicare defines these "covered" hospitals as those which had an arrangement in place with an independent laboratory or other supplier prior to July 22, 1999, to provide the TC of certain

pathology services for the hospital's inpatients and outpatients and pursuant to which the independent laboratory or other supplier billed the Medicare Part B program directly. Because IML did not have an arrangement with JMH to bill Medicare directly for these TC services prior to July 22, 1999 (JMH had conducted its own lab work in-house prior to Dr. Ruiz's appointment in 2006), IML would not be entitled to TC Grandfather status and could not bill Medicare directly. Despite its lack of TC Grandfather status, as will be seen below, Dr. Ruiz and IML falsely submitted claims directly to Medicare and were paid for those claims under the TCGrandfather provision in addition to JMH being paid for those very same TC claims through Medicare DRG payments, resulting in double-billing.[6]

## VI.   Other Federally-Funded Health Care Programs

59)     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were also, in many instances, beneficiaries of one of three federally-funded health care benefit programs -- Medicare, Medicaid, or TRICARE/CHAMPUS. Accordingly, in addition to Medicare, the other two programs are briefly discussed as well.

60)     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level, and as with Medicare, physicians, hospitals, and laboratories may recover costs

---

[6]Effective July 1, 2012, the TC Grandfather exception expired and only the hospital my bill for the TC of anatomic pathology services provided to a hospital inpatient or outpatient with dates of service on or after July 1, 2012.

and charges arising out of the providing of *appropriate* and *necessary* care to Medicaid beneficiaries.

61)    Medicaid is a partnership between the states and the federal government, with each paying about half the cost. Each state operates its own Medicaid program under a state plan that must be approved by CMS.

62)    In the State of Florida, the Agency for Health Care Administration ("AHCA") is responsible for administering the Medicaid program for Florida residents. The Department of Children and Families is the agency responsible for enrolling people in Medicaid. AHCA contracts with other state agencies and private organizations, like Defendant UM, and Defendant JMH, to provide the broad range of services that Medicaid offers its participants.

63)    Medicaid serves approximately 3.19 million people in Florida, with over half of those being children and adolescents twenty (20) years of age or younger. Estimated expenditures for Fiscal Year 2011-12 (July 2011 through June 2012) were approximately $20.3 Billion Dollars.

64)    TRICARE, formerly known as CHAMPUS, is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty military service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq*.). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or

injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## SUBSTANTIVE ALLEGATIONS

65)    During the organ transplant process, including pre and post-transplant, laboratory testing is conducted through biopsies and the collection of tissues and blood, which are then evaluated through specific testing. Prior to 2006, pathology tests ordered for organ transplant patients at JMH's MTI were conducted in-house by JMH laboratories and the JMH Department of Pathology, with the exception of histocompatibility testing (HLA) and certain low volume non-HLA esoteric blood tests, which were performed by IML at the UM Department of Surgery.

66)    In or around late 2006, Dr. Ruiz, previously a member of the UM Department of Pathology, was named Medical Director of the Transplant Laboratories at UM, a division of the UM Department of Surgery, which includes IML. Almost immediately, Dr. Ruiz moved all of the pathology testing responsibilities for transplant and many non-transplant patients from JMH's laboratory and into IML. Though part of the Department of Surgery at UM, IML conducts all of the laboratory testing for JMH's transplant patients being treated at JMH's MTI and in JMH's clinics.[7] Accordingly, UM bills JMH for the laboratory services conducted by IML at a much higher cost than if those same services would have been performed by JMH (the pre-Ruiz/IML arrangement). JMH then passes those inflated costs through to Medicare on the Medicare Cost Report and uses those Medicare dollars to remit payment to IML. As detailed below, using IML as the vehicle for furthering the fraud, the Defendants created, perpetrated, and

_____

[7] Relators have also learned that IML currently has a similar arrangement with Broward General Hospital wherein IML performs all of the laboratory testing related to Broward General Hospital's transplant program.

have attempted to cover-up an illegal kickback scheme in overbilling Medicare and the unnecessary over-utilization of medical procedures and testing.

67)    Moreover, Relators have personal knowledge, and have reason to know as a result of their high-level positions at UM, that millions of dollars in claims were submitted to the federal government through over-billing, double-billing, and the submission of unnecessary procedures and tests.  Relators also have personal knowledge, and have reason to know as a result of their high-level positions at UM, that despite multiple complaints regarding said overbilling practices submitted to their professional superiors and an investigation conducted into these allegations, no action was taken by Defendants to refund these ill-gotten gains to federally-funded health care programs or to otherwise self-report this widespread problem between UM and JMH, or to implement remedial measures in order to cease and desist the continued submission of these false claims.

I.    **Medicare Billing Procedures Between IML and JMH**

68)    In accordance with CMS Pub. 100-04, Medicare Claims Processing, JMH is paid for transplant cases through Medicare Bundled Packages, categorized through diagnosis-related group ("DRG") payments, which are reported through Medicare Cost Reporting.  An Annual Operating Agreement ("AOA") Payment Schedule is generated by and proposed between JMH and UM for each calendar year to provide services for the UM physicians and laboratories, including IML.[8]  In agreeing to the AOA Payment Schedule, UM – and IML – agree to be paid for services by JMH based on the DRG payment and the Medicare Cost Report JMH receives from Medicare.  Under this arrangement, all descriptions of work included on the AOA Payment Schedule would be paid by JMH to UM/IML, with no direct payments to IML from Medicare.

---

[8] *See* JMH AOA Schedule proposed for 2013 (Exhibit "D").

## II.    Direct Third Party Billing for Hospital Patients

69)    Despite JMH receiving Medicare DRG payments for the services performed by IML *and* IML's ineligibility under the TC Grandfather Provision for direct payment of TC component services, IML nonetheless billed Medicare directly for those same services paid to JMH by Medicare, including post-transplant biopsies and associated special testing, receiving payment directly from Medicare, and resulting in a double payment from Medicare.  Shortly after Dr. Ruiz became Medical Director of IML, laboratory test biopsies were transferred directly into IML, bypassing the JMH laboratories which violated JMH bylaws[9], the Joint Commission and College of American Pathologists Laboratory Accreditation Program under which JMH is accredited, and even though Medicare claims submitted by JMH had already been allocated for these biopsies.  In fact, UM surgeons working in MTI aided the unauthorized transfer of the biopsies by contacting IML to retrieve the tissue and blood rather than have JMH's Laboratories handle the samples, resulting in IML's direct billing of Medicare through UM's Department of Surgery.  They did this knowing it was a clear violation of hospital tissue committee by-laws. IML then proceeded to submit direct bills to Medicare for the TC component of laboratory work it performed on JMH patients.  The resulting Medicare payments to the UM Department of Surgery for the work performed at IML represented a double-payment by Medicare of the TC component because JMH, through its DRG payment, had already received Medicare payments for these same services.

---

[9] JMH bylaws, consistent with the bylaws of most hospitals where transplant surgery is performed, require that any tissue collection must remain in the hospital laboratory. Dr. Ruiz and IML's practice of removing tissue and blood from JMH and effecting a transfer to the IML lab, located outside of the hospital, clearly violates these rules.

70)   Upon the expiration of the TC Grandfather Provision on July 1, 2012, Dr. Ruiz notified JMH that he had been providing the services and billing Medicare directly for TC services under this provision and now wished to bill JMH for these services (which should have been done all along as IML did not qualify under the TC Grandfather exception).  For the month of July 2012, Dr. Ruiz on behalf of IML, sent an invoice to JMH's Department of Pathology for a payment in excess of $33,000.   Separately, Dr. Ruiz misused, against JMH policies and procedures, JMH Pathology's laboratory information system to bill Medicare for professional components ("PC") of these services for which the Medicare professional fees were paid to UM Pathology, through its billing and collection services under the direction of Relator, Mr. Yelen. When Relator, Mr. Yelen, attempted to clarify the payments, including a request for information on the types of procedures performed and whether bills had already been invoiced and paid for TC, he was met with resistance by the Department of Surgery and Dr. Livingstone, the Chair of Surgery and, at the time, CEO of UM Medical Group which had oversight of all UM non-hospital clinical departments including UM Pathology and Surgery, and was strongly coerced into transferring the payment against his will.[10]  Relator, Mr. Yelen, reported these questionable billing practices to UM's Internal Audit Department but no action was taken to rectify the billing discrepancies.  At this point the Relators became aware that IML through the UM Department of Surgery was illegally submitting false – and duplicate – claims to Medicare for services already reimbursed to JMH through the DRG payments.

71)   Clearly, neither JMH, which reaped the additional IML-designated payment from Medicare nor UM, which overbilled and overcharged Medicare directly for those very same

---

[10]*See* email trail (Exhibit "E").

services, were motivated to resolve and correct this financially beneficial and unlawful arrangement.

## III.   Unnecessary Protocols Resulting in Overbilling for Unnecessary Lab Procedures

72)   In furthering its attempts to overbill and collect overpayments from Medicare, Dr. Ruiz and IML developed "protocols" for transplant and post-transplant care beginning in or around late 2007.[11]  These protocols – or standing orders – were engineered to automatically subject the physicians caring for the patient to subject the patient to uniformed laboratory testing performed by IML on a set-schedule basis, regardless of the patient's condition.   Thus, a physician caring for a patient with no indication that a particular laboratory test was required, as per the IML-mandated protocols, subjected the patient to undergo the tests.  The protocols were grossly inflated and unnecessary and in certain circumstances caused adverse impact to patients' conditions and health.

73)   In 2011, a group of UM nephrology faculty physicians refused to agree with these set protocols and declined to sign said orders for many post-transplant patients.  Despite the refusal of the UM nephrology physicians, IML proceeded with performing the unnecessary tests without the consent of the patients' treating physicians.   Later in 2011, those same UM nephrology physicians developed a set of laboratory testing protocols, which eliminated all of the unnecessary testing imposed on the physicians by the IML protocols.  After a few weeks of reduced volume and declining revenues to IML, Dr. Ruiz and Dr. Livingstone overruled the UM nephrology physicians, who were legally and clinically responsible for these post-transplant patient care episodes, and ordered the previous inappropriate protocols to be restored for use in

---

[11]*See* Post Kidney or Kidney-Pancreas Transplant Protocol (Exhibit "F").

all transplant patients.[12]The former IML laboratory manager, Ramiro Fernandez, also disagreed with the imposition of the protocols but was rebuffed by his attempts to correct these errors by Dr. Livingstone and Dr. Ruiz.[13] He was subsequently terminated shortly thereafter.

74)   In November 2011, Relator Yelen voiced his concerns about the unnecessary procedures outlined in the protocol orders and filed a complaint, with supporting documentation, with UM's Ethics Hotline, but no action was taken to remedy the matter. Further, Relator Chen addressed the inappropriateness of the standing order sets to the UM administration with no remedial action taken by UM.[14]Instead, UM/IML continued to subject transplant patients to unnecessary lab testing costing Medicare millions of dollars.

75)   Further illustrating that these false claims result from overutilization and unnecessary testing is the fact that the costs billed for services submitted by IML far exceed the same costs generated by JMH's in-house laboratory, as evidenced by the unexplained increase in IML's annual revenue despite a stable number of transplant patients.

## IV.   Defendants Created, Perpetrated, and Covered-Up an Illegal Kickback Scheme

76)   The aforementioned double-billing, over-billing, and ordering of unnecessary testing by IML was allowed to continue and thrive due to an illegal arrangement between UM and JMH designed to unjustly enrich UM's Department of Surgery in exchange for the promise to continue to perform surgeries at JMH.  This quid pro quo arrangement allowed JMH to continue to reap the revenues of surgical operations, including the highly profitable area of transplant procedures, performed in its facilities by UM surgeons, while the surgeons were

---

[12]*See* Ex. "F", date of revision.

[13]*See* email trail from Ramiro Fernandez (Exhibit "G").

[14]*See* Chen email dated November 25, 2011 (Exhibit "H").

allowed to control JMH's MTI laboratory testing in order to increase the UM Department of Surgery's revenues.

77) Further, this arrangement yielded performance bonuses, merit increases, and discretionary funds for the surgeons. As a result of the UM Department of Surgery being rewarded with absolute control over IML testing for JMH's MTI patients in return for continuing to perform surgeries at JMH, this arrangement violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Moreover, the illegal scheme was further evidenced by the preventing of Relators' continued efforts to move the IML laboratory to the UM Department of Pathology.

## V.   Relators Attempts to End the Illegal Kickback Scheme

78) In January 2012, Relator Chen met with Alex Contreras-Soto, JMH's newly-appointed Senior Vice President and Chief Administrative Officer,[15] in an effort to reduce the costs incurred by the JMH pathology services. The most notable item was the inflated costs to JMH for the testing performed by IML. Dr. Chen supported a proposal developed by JMH to transfer the laboratory tests currently performed by IML to JMH's Department of Pathology which would reduce costs by 60% to 80%. Dr. Chen and Mr. Contreras-Soto presented this plan to Dr. Livingstone and Mr. Warwar who declined the proposal and stated that any changes to IML would not only disrupt the transplant program but would adversely affect all of the Department of Surgery and would cause "collateral damages."[16] Subsequently, Relators were advised that the JMH leadership withdrew the plan and no changes were implemented.

79) On the UM side, after multiple internal audits which recognized the potential exposure IML caused to UM for fraudulent activities, UM's senior management made the

---

[15] It is believed that Mr. Contreras-Soto, at the time of this meeting, was unaware of the fraudulent billing scheme orchestrated by JMH and UM.

[16]*See* email from Livingstone to Cote dated January 11, 2012 (Exhibit "I").

decision to move IML into UM's Department of Pathology in order to responsibly oversee and rectify IML's billing and regulatory compliance issues. Dr. Richard Cote, UM's Chair of Pathology, was coordinating with Joseph Natoli, Chief Financial Officer for UM and Chief Operating Officer for UM's Miller School of Medicine, regarding the status of the IML move into the Department of Pathology.[17]  Mr. Natoli informed Dr. Cote that he met with Donald Steigman, JMH's Chief Operating Officer, who expressed concern with any changes to IML, which would "upset the UM surgeons".  Despite being advised about the multiple Medicare violations and the inefficient and excessive cost to Medicare, Mr. Natoli and Mr. Steigman declined to intervene and adopt a plan to relocate IML into UM's Department of Pathology in order to correct the fraudulent activities for fear of retribution from the UM Department of Surgery and its surgeons.

80)     On October 7, 2013, Relator Yelen spoke with David Seo, M.D., Chief Medical Information Officer at UM.  Dr. Seo advised Mr. Yelen that he spoke with Mr. Natoli regarding the proposal to relocate IML into UM's Department of Pathology and Mr. Natoli explained that Carlos Migoya, Chief Executive Officer of JMH told Mr. Natoli that should the transfer occur, JMH would question whether UM was the right business partner for JMH.[18]

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)**

81)     The United States of America re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

---

[17]*See* email from Natoli to Dr. Cote dated September 24, 2013 (Exhibit "J").

[18]*See* email dated October 8, 2013 (Exhibit "K").

82)    This is a claim for treble damages, civil penalties, and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

83)    By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States. The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

84)    By reason of the payment of said fraudulent claims, , the United States has incurred money damages, and continues to be damaged in a substantial amount.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

85)    The United States of America re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

86)    This is a claim for treble damages, civil penalties, and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

87)    By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements in support of and material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B). The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

88)    By reason of the payment of said financial claims, the United States has incurred money damages and continues to be damaged in a substantial amount.

## THIRD CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)

89)    The United States of America re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

90)     This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

91)     By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

92)     By virtue of the false and/or fraudulent statements made to the government and the concealment by Defendants, the United States has been damaged, and continues to be damaged, in a substantial amount.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT, Fla. Stat. § 68.082(2)(a)

93)     The State of Florida re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

94)     This is a claim for treble damages, civil penalties, and attorney's fees, under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

95)     By means of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

96)     By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT, Fla. Stat. § 68.082(2)(b)

97)    The State of Florida re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

98)    This is a claim for treble damages, civil penalties, and attorney's fees, under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

99)    By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by an agency, in violation of Fla. Stat. § 68.082(2)(b).

100)    By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## SIXTH CAUSE OF ACTION
### VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT, Fla. Stat. § 68.082(2)(c)

101)    The State of Florida re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

102)    This is a claim for treble damages, civil penalties, and attorney's fees, under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

103)    By means of the acts described above, Defendants knowingly conspired to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid, in violation of Fla. Stat. § 68.082(2)(c).

104)    By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## SEVENTH CAUSE OF ACTION
### VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT, Fla. Stat. § 68.082(2)(g)

105) The State of Florida re-alleges and incorporates paragraphs 1-80 as if fully set forth herein.

106) This is a claim for treble damages, civil penalties, and attorney's fees, under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

107) By means of the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to an agency, in violation of Fla. Stat. § 68.082(2)(g).

108) By virtue of the false or fraudulent statements made to the government and the concealment by Defendants, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs/Relators pray that upon trial or final hearing the Court will enter a final judgment for Plaintiffs/Relators and the United States against Defendants, as follows:

(a) For civil penalties of $5,500 to $11,000 for each false claim pursuant to 31 U.S.C. § 3729(a); and pursuant to Fla. Stat. § 68.082(2);.

(b) For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a); and pursuant to Fla. Stat. § 68.082(2);

(c) For court costs;

(d) For pre-judgment and post-judgment interest at the rates permitted by law;

(e) For such other and further relief as may be appropriate and authorized by law; and

(f) Plaintiffs/Relators further pray that they be awarded an appropriate percentage of the amount recovered by and for the United States as a

result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with 31 U.S.C. § 3730(d); and

(g)     Plaintiffs/Relators further pray that they be awarded an appropriate percentage of the amount recovered by and for the State of Florida as result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with Fla. Stat. § 68.085.

## DEMAND FOR TRIAL BY JURY

Plaintiffs/Relators demand a trial by jury of all issues so triable as a matter of right.

Dated:  November 27, 2013

Respectfully submitted,

By: _____

Tod Aronovitz (FBN 186430)
ta@aronovitzlaw.com
Barbara Perez (FBN 989304)
bp@aronovitzlaw.com
Andrew Zelmanowitz (FBN 74202)
az@aronovitzlaw.com
ARONOVITZ LAW
2 S. Biscayne Boulevard
Suite 2630 – One Biscayne Tower
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

*Attorneys for Plaintiffs/Relators*